UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| HARLEY ORR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.: |
| | ) |
| JAMES D. JULIA, INC., | ) |
| | ) |
| and | ) |
| | ) |
| JAMES D. JULIA | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT; DEMAND FOR JURY TRIAL; REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff Harley "Skip" Orr hereby complains against Defendants as follows:

**SUMMARY OF THE ACTION**

1.  James D. Julia told Skip Orr the reason he was terminating Mr. Orr's employment: *because Mr. Orr said he was planning on filing a charge of discrimination with the Maine Human Rights Commission.* Mr. Julia said that he could no longer trust Mr. Orr after that. About six months earlier, Mr. Orr's disabilities, including severe chemical sensitivity, and James D. Julia Inc.'s unwillingness to provide a safe workplace, had forced Mr. Orr to work from home. Mr. Orr was very successful working from home and was able to obtain numerous high-value gun collections for James D. Julia, Inc.'s highly profitable fall 2005 auction, the most successful gun auction ever held anywhere in the world, with gross sales of over $9.2 million. Mr. Julia knew, however, that Mr. Orr's disability greatly limited his employment opportunities and exploited Mr. Orr's

1

vulnerability when he unilaterally cut Mr. Orr's *contractual* incentive pay by about $75,000 just weeks after the fall 2005 auction.  Mr. Julia cut the incentive pay even as he *significantly increased* the goal of the spring 2006 auction because Mr. Orr had had been so successful that he had already obtained numerous gun collections for that auction.  When Mr. Orr complained about the disability discrimination, he was terminated in retaliation less than one week later.  Mr. Orr **is not** seeking any relief in this Complaint for unlawful discrimination on the basis of his disability, and he **is not** seeking relief for any unlawful denial of a reasonable accommodation.  Mr. Orr had a reasonable good faith belief that he was being discriminated against on the basis of his disability and **he was unlawfully retaliated against** when he opposed and complained about that discrimination.  Moreover, even after Mr. Orr was terminated, Defendants continued to retaliate by defaming Mr. Orr to at least one other auction house, which not only damaged Mr. Orr's professional reputation but cost him a job.  Finally, Mr. Orr worked a significant amount of unpaid overtime during his employment and the company continues to refuse to pay him despite his demand that it do so.  As a result of the Defendants' unlawful conduct, Mr. Orr is seeking the full available remedies including declaratory relief, injunctive relief and reinstatement, back pay and benefits, compensatory and punitive damages, liquidated damages, and reasonable attorney's fees and expenses.

## PARTIES

2.  Plaintiff Harley "Skip" Orr ("Mr. Orr") is a citizen of the United States and a resident of Solon, Maine, Somerset County.

3. Defendant James D. Julia, Inc. is a corporation organized under the laws of Maine with a principal place of business in Fairfield, Maine, Somerset County. In 2005, it had in excess of 15 employees during 20 or more weeks of that year. In 2004, it had in excess of 15 employees during 20 or more weeks of that year.

4. Defendant James D. Julia owned (not solely) and actively managed James D. Julia, Inc. at all relevant times. He is a citizen of the United States and a resident of Maine.

## JURY TRIAL DEMAND

5. Under Fed. R. Civ. P. 38(b), Plaintiff hereby demands trial by jury on all issues triable to a jury.

## JURISDICTION AND VENUE

6. This action arises under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, the Fair Labor Standards Act, 26 U.S.C. §§ 201-219, the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-4634, the Maine Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831-840, Maine's Minimum Wages statutes, 26 M.R.S.A. §§ 661-672, Maine's Wages and Medium of Payment statutes, 26 M.R.S.A. §§ 626-626-A, and Maine common law. This court has proper subject matter jurisdiction under 28 U.S.C. §§ 1341 and 1343. This Court has proper supplemental jurisdiction over Plaintiff's state law claims, which are related and form part of the same case or controversy as the federal claims, under 28 U.S.C. § 1367(a).

7. Venue is proper in the District of Maine under 28 U.S.C. § 1391(b). Under Local Rule 3(b), this action is properly filed in Bangor because this case arises in Somerset County.

## FACTUAL ALLEGATIONS

8. Harley "Skip" Orr began working at James D. Julia, Inc. in May 1999. James D. Julia, Inc. is an auction house. It earns commissions from sellers whose goods are sold the company's auctions and it also earns money by charging buyers a percentage of the value of the items they buy.

9. In January 2002, Mr. Orr became the Assistant Sales Coordinator of the Firearms Division. His primary duty was as a salesperson selling the auction services of the company. His sales objectives included convincing potential consignors of goods that James D. Julia, Inc. was the best place for them to consign and convincing potential buyers to purchase those goods.

10. Up until just after the fall 2005 auction, the Firearms Division consisted of three employees. Mr. Julia was the Sales Coordinator, Mr. Orr was the Assistant Sales Coordinator, and another employee performed various clerical duties.

11. Throughout Mr. Orr's employment, Mr. Julia was a corporate officer, had a significant ownership interest in the Company, and had operational control of significant aspects of the corporation's day to day functions, including compensation of employees.

12. Throughout his employment at James D. Julia, Inc., Mr. Orr was engaged in commerce and James D. Julia, Inc. was an enterprise engaged in commerce.

13. During his employment as Assistant Sales Coordinator, Mr. Orr frequently worked a workweek longer than forty hours without receiving compensation for his employment in excess of forty hours at a rate not less than one and one-half times the regular rate at which he is employed. The cumulative annual amount of hours worked in

excess of forty in a week was at least 260 hours for the years beginning January 1, 2001 and ending December 31, 2005.

14. Mr. Orr performed his duties well. The Firearms Division had been a part of Julia's operation for approximately twenty years and during the four years that Mr. Orr was the Assistant Sales Coordinator, the yearly auction totals for the Division increased from about $4-5 million in total sales in 2002 to about $14 million in 2005.

15. In March 2005, just months before Mr. Orr's termination in November, the company recognized in Mr. Orr's performance evaluation that his work had a positive impact on the company's bottom line: "Your commitment to contacting consignors and keeping on track to get consignments . . . has been commendable and the result is shown [in] the gross sales of the auctions this year."

16. Mr. Julia also recognized Mr. Orr's contributions in a letter to Mr. Orr in spring 2005:

> The great success is a result of our entire organization pulling together but you have been an instrumental part of this and I recognize and appreciate it. It is not infrequent that I receive a compliment about you from someone who has interacted with you over the telephone. I appreciate your interest and knowledge of guns, and I also appreciate the diversity of attributes you have that assist the firearms division.

17. After Mr. Orr became Assistant Sales Coordinator in 2002, Mr. Julia often considered reducing his own role in the Firearms Division and told Mr. Orr that if an experienced sales coordinator ever became available, Mr. Julia would likely hire that person and reduce his own role in the Division. Mr. Julia was clear with Mr. Orr that if he hired a new sales coordinator, the incentive pay for the Division would have to be

restructured and Mr. Orr's incentive pay would likely decrease depending on the tasks the new person assumed.

18. Mr. Orr suffers from severe chemical sensitivity, which is an infirmity caused by environmental conditions or disease or illness. His disability is a physiological disorder affecting, among other things, the respiratory and cardiovascular system of the body. Exposure to fragrances causes severe asthma, migraine headaches, and elevated blood pressure. Some exposures are so serious they require medical care in a hospital emergency room.

19. Mr. Orr's disability substantially limits several major life activities, including breathing, caring for himself, interacting with others, and working. He is not able at all to go to some indoor public places such as grocery stores, pharmacies, airplanes, buses, trains, and restaurants. Moreover, he is only able to go into any public building rarely and in unusual circumstances. Finally, he is only rarely, and with special precautions, able to be in any public places where he will be very near to other people. He depends for the basic necessities of life on his wife.

20. In May 2005, Mr. Orr suffered two significant exposures to fragrances at work. The first episode required treatment at a hospital emergency room. The second episode was also so serious that his doctor urged him to go to the emergency room although Mr. Orr declined because he feared additional exposure to fragrance at the hospital.

21. After the second serious exposure in May 2005, Mr. Orr's doctor wrote a letter to James D. Julia, Inc. explaining the severity of Mr. Orr's condition and

recommending that Mr. Orr avoid the office environment and work from home if possible.

22. Since Mr. Orr had previously requested accommodations that would have allowed him to continue working at the Company's offices and those requests had been refused, he requested the accommodation of working from home.

23. Mr. Julia agreed to Mr. Orr's request to work from home and sent Mr. Orr an e-mail on June 9, 2005 confirming that Mr. Orr could work from home.

24. During Mr. Orr's employment as Assistant Sales Coordinator, he worked under an employment contract that determined his pay. Mr. Julia had control over and set Mr. Orr's salary and established Mr. Orr's incentive pay formula. In March 2005, Mr. Orr signed a contract with Julia that applied to the time period of December 1, 2004 through November 30, 2005. Mr. Orr's overall pay was based on the financial success of the spring auction in March 2005 and the fall auction in October 2005.

25. In the June 9, 2005 e-mail, Mr. Julia conveyed his decision to hire an additional employee: "I will definitely need to hire someone." Mr. Julia also informed Mr. Orr that his new role might result in a future change to Mr. Orr's compensation.

26. When Mr. Julia said in his June 9, 2005 e-mail that Mr. Orr's compensation might change, the understanding between Mr. Julia and Mr. Orr was the Mr. Orr's compensation might change *after* the current contract ended and Mr. Orr and Mr. Julia had a chance to assess how the new arrangement was working. Mr. Julia's conduct was consistent with that approach. He never modified or even mentioned modifying the written contract for 2005. He also did not hire the new employee, the cost

of which could serve as reason to reduce Mr. Orr's compensation, until *after* the fall auction in 2005.

27.   Mr. Orr continued to work full time after he began working from home. He was now able, however, to spend far more time procuring high-value gun collections for auction and finding interested buyers for those collections. That focus on the revenue generating function of his job was successful. The fall auction was the largest gun auction ever held anywhere in the world, with sales of $9.2 million.

28.   Mr. Orr was so successful working from home, that by the time of the fall auction in 2005, he had already lined up a number of good collections for the spring auction in 2006. Because of Mr. Orr's hard work procuring collections for the spring 2006 auction, Mr. Julia raised the company's goal for that auction in October 2005 from about $4.5 million to $6 million.

29.   Between about June 1, when Mr. Orr began working from home, and the close of the fall 2005 auction, Mr. Julia did not inform Mr. Orr of problems arising from Mr. Orr working from home.

30.   It was only *after* the record fall 2005 auction was complete that Mr. Julia told Mr. Orr that he was cutting Mr. Orr's incentive pay **by over 42%**, from an estimated $177,550 to an estimated $102,550.

31.   Mr. Julia knew that Mr. Orr's disability severely limited his employment options and Mr. Julia exploited that vulnerability to violate his own contractual agreement with Mr. Orr and unilaterally cut Mr. Orr's incentive pay.

32.   Mr. Julia sent Mr. Orr a letter dated November 21, 2005 informing Mr. Orr of the cut in pay. In that letter, Mr. Julia made it clear that he intended to hire an

additional employee but that Mr. Orr would continue to work at the Company: "In addition, [the new employee] will be expected to do some other types of responsibilities and work and *it is my goal to try to run the division in the future with the three of you* [Judy Labbe, the new employee, and Mr. Orr.]."

33. On November 22 or 23, Mr. Orr spoke with Mr. Julia about the cut in pay. Mr. Orr told Mr. Julia that they had a contract for the 2005 year, that the cut in pay violated that contract, and that Mr. Julia should honor that contract. Mr. Julia refused. Mr. Orr told Mr. Julia that he believed that this was disability discrimination and that he would be filing a charge of discrimination with the Maine Human Rights Commission.

34. Mr. Julia did not speak with Mr. Orr again until several days later, on November 28. Mr. Julia told Mr. Orr that he was fired because Mr. Orr had said he was going to file a charge of discrimination with the Maine Human Rights Commission. Mr. Julia said that he could no longer trust Mr. Orr after that.

35. In August 2003, Mr. Orr filed a charge of discrimination with the Maine Human Rights Commission and the federal Equal Employment Opportunity Commission against James D. Julia, Inc. for failure to provide a reasonable accommodation for Mr. Orr's disability.

36. After Mr. Julia learned of the 2003 charge of discrimination, he became very angry. He came to Mr. Orr's office and berated him for filing the charge. Mr. Julia was red in the face and shouting when accused Mr. Orr of putting the whole company "at risk" and accused Mr. Orr that his complaint "jeopardized" the existence of the organization. He told Mr. Orr that he was going to bring a document to Mr. Orr that Mr.

Orr had to sign saying that Mr. Orr had been properly accommodated by Julia. Mr. Orr never signed such a document.

37. In March 2006, several months after he terminated Mr. Orr, Mr. Julia paid Mr. Orr a significant portion of Mr. Orr's 2005 contractual incentive pay.

38. Mr. Julia retaliated against Mr. Orr, however, by reducing the total amount of incentive pay due to Mr. Orr. Mr. Orr's incentive pay for 2004 was roughly $160,000. Based on the 18% increase in sales in 2005, his incentive pay for 2005 should have been approximately $190,000, representing an 18% increase over his 2004 incentive pay. Mr. Orr was only paid $157,850.03, resulting in a loss of over $30,000 in incentive pay.

39. Mr. Julia retaliated against Mr. Orr by denying him the $7,000 bonus the company paid to all employees for the fiscal year that ended November 30, 2005.

40. On May 19, 2006, Mr. Orr filed a charge of discrimination with the Maine Human Rights Commission and Equal Employment Opportunity Commission alleging disability discrimination and retaliation for reporting and opposing disability discrimination.

41. Mr. Orr has received a Notice of Right to Sue letter from the Maine Human Rights Commission pursuant to 5 M.R.S.A. § 4612(6)

42. Mr. Orr received a Dismissal and Notice of Rights Letter from the U.S. Equal Employment Opportunity Commission on January 25, 2007. The letter advised Mr. Orr of his right to file a lawsuit for disability discrimination and retaliation within ninety days of receiving the letter.

43. Mr. Orr has satisfied one or more of the prerequisites to be awarded attorney fees and all available damages under the Maine Human Rights Act.

44. Mr. Orr has exhausted his administrative remedies for all claims in this action that require administrative exhaustion.

45. Mr. Orr made a demand at the office of the employer where payrolls are kept and wages are paid for his unpaid incentive pay and unpaid overtime. He was not paid in full on the next day on which employees would regularly be paid or within two weeks after the day on which the demand was made.

46. After Mr. Orr was terminated from employment with James D. Julia, Inc., Mr. Orr applied for a job at another auction house.

47. Mr. Orr learned from that prospective employer that James D. Julia made false statements to the prospective employer about Mr. Orr's separation from employment.

## LEGAL CLAIMS

### First Count

**(Unlawful Retaliation by Defendant James D. Julia, Inc.)**

48. The allegations in paragraphs 1-47 are realleged.

49. By virtue of the foregoing, (1) defendant James D. Julia, Inc. discharged, threatened and otherwise discriminated against Mr. Orr with respect to his tenure, location, and terms, conditions, and privileges of his employment because he reported and opposed, in good faith, what he reasonably believed to be violations of the Americans with Disabilities Act and the Maine Human Rights Act in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, the Maine Human Rights Act, 5 M.R.S.A. §§ 4551-4634, and the Maine Whistleblowers' Protection Act, 26 M.R.S.A. §§ 831-840; (2) James D. Julia, Inc. coerced, intimidated, and interfered with

Mr. Orr because of Mr. Orr's exercise or enjoyment of the rights granted or protected by the Maine Human Rights Act; (3) Mr. Orr's charge of discrimination against James D. Julia, Inc. in August 2003 was a motivating and substantial factor in Mr. Julia's decision to terminate Mr. Orr's employment; and (4) Mr. Orr's stated opposition to Mr. Julia's decision to cut Mr. Orr's incentive pay because it amounted to unlawful disability discrimination and Mr. Orr's stated intention to file a charge of discrimination with the Maine Human Rights Commission were motivating and substantial factors in the decision to terminate Mr. Orr's employment, to deny Mr. Orr a year end bonus of $7,000, to threaten Mr. Orr with the loss of his 2005 incentive pay, and to cut the amount of that incentive pay.

50. As a direct and proximate result of the defendants' intentional retaliation, Mr. Orr has suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

51. Plaintiff requests relief as follows:

(a) enter declaratory relief that the James D. Julia, Inc. has engaged in unlawful retaliation against the plaintiff;

(b) enter injunctive relief ordering James D. Julia, Inc. to require affirmative training and other steps to reduce the likelihood of similar unlawful retaliation by the defendants in the future and order defendants to desist from all unlawful discrimination;

(c) award back pay for lost wages and benefits, prejudgment interest on back pay and benefits, and reinstatement or front pay for future lost wages and benefits;

(d) award compensatory and punitive damages in an amount to be determined at trial and prejudgment interest thereon;

(e) award plaintiff his full costs, including reasonable attorney's fees and expert fees; and

(f) award such further relief as is deemed appropriate by the Court.

## Second Count

**(Unlawful Refusal to Pay Earned Wages and Overtime against both Defendants)**

51. The allegations in paragraphs 1-50 are realleged.

52. By virtue of the foregoing, the Defendants have willfully violated the Plaintiff's rights to payment of overtime wages under both the federal Fair Labor Standards Act, 26 U.S.C. §§ 201-219, and Maine law, 26 M.R.S.A. §§ 661-672. The Defendants have also willfully violated Maine's Wages and Medium of Payment statutes, 26 M.R.S.A. §§ 626-626-A.

53. The Plaintiff suffered damages of unpaid overtime over the last six years of equal to or greater than 260 hours per year.

54. The Plaintiff requests relief as follows:

(a) an award of unpaid wages, unpaid overtime wages and prejudgment interest thereon;

(b) an additional amount equal to two times such unpaid wages and overtime wages as liquidated damages;

    (c)    his full costs of suit, including reasonable attorney's fees, and;

    (d)    such further relief as is deemed appropriate by the Court.

## Third Count

### (Unlawful Defamation against both Defendants)

55. The allegations in paragraphs 1-54 are realleged.

56. By virtue of the foregoing, James D. Julia, in the scope of his employment at James D. Julia, Inc., has made false, defamatory, and unprivileged statements concerning Harley Orr to at least one person when he knew that those statements were false or recklessly disregarded that they were false. The false statements were made out of Mr. Julia's ill will towards Mr. Orr.

57. As a direct and proximate result of Mr. Julia's false and defamatory statements, Mr. Orr has suffered and will continue to suffer damages.

58. The Plaintiff requests relief as follows:

    (a)    economic damages, including damages for lost wages;

    (b)    damages for injury to reputation;

    (c)    punitive damages; and

    (d)    such further relief as is deemed appropriate by the Court.

Dated: April 23, 2007

/s/ David G. Webbert
David G. Webbert, Esq.

/s/ Matthew S. Keegan
Matthew S. Keegan, Esq.

Johnson & Webbert, LLP
160 Capital Street, P.O. Box 79
Augusta, Maine 04332-0079

                                                     dwebbert@johnsonwebbert.com
                                                     mkeegan@johnsonwebbert.com

                                                     Tel: (207) 623-5110

                                                   Attorneys for Plaintiff