UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| HARLEY ORR, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civ. No. 07-51-B-W |
| | ) | |
| JAMES D. JULIA, INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

The defendant in this case terminated the plaintiff's employment after the plaintiff
threatened to assert a claim of disability discrimination in connection with a dispute over bonus
compensation. After terminating the employment relationship, the defendant voluntarily
tendered the requested bonus, hoping to avoid litigation. When, subsequently, the plaintiff filed
this civil action against the defendant, asserting retaliatory discharge and violation of Maine
wage payment and overtime laws, the defendant counterclaimed for unjust enrichment, among
other things, seeking a return of the bonus payment. The plaintiff then amended his complaint,
alleging that the counterclaims were asserted in retaliation for his commencement of a civil
action.

The defendants have filed a motion for summary judgment against all of the plaintiff's
claims. The plaintiff has filed a cross-motion for partial summary judgment against the
defendants' contract and unjust enrichment claims. The Court referred those motions to me for
recommended decision. Based on my review of the parties' legal memoranda and the summary

judgment record I recommend that the Court grant the defendants' motion in part and deny the plaintiff's motion.

FACTS

The following facts are material to the parties' motions for summary judgment. The facts are drawn from the parties' statements of material facts filed in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Factual disputes have been resolved in favor of the non-movant, Harley Orr, and the recitation of a "fact" herein does not mean that it is undisputed by the Julia defendants.

**A.      Facts pertaining to the plaintiff's employment claims**

In May of 1999, Defendant James D. Julia, Inc. (JDJ) hired Plaintiff Harley Orr to serve JDJ as a "cyber auction" manager, understanding at that time that Orr suffered from sensitivities to perfume and cologne, and that these sensitivities led to problems with his former employer. (Statement of Facts, Doc. No. 39, ¶¶ 1-2.[1]) In order to accommodate Orr's sensitivity JDJ imposed a "no fragrance" policy on its employees and on contractors who visited the office. JDJ also excused Orr from working in public settings. (Id. ¶¶ 3-4.) Orr's base annual salary in 1999 was $30,000. In 2000, the base annual pay went to $31,000. In 2001, it went to $31,970 and Orr received a bonus of $5,000. (Id. ¶¶ 5, 7, 8.) JDJ closed its "cyber division" in 2002 for lack of

---

[1]      Orr's opposing statement of material facts reproduces the content of the Julia defendants' statement and supplies an additional statement of material facts as well. I cite this document rather than the defendants' underlying statement to avoid cluttering my factual statement with multiple citations. Because the additional statements offered by Orr are not consecutively numbered I will refer to the paragraphs in the additional statement with the suffix A, as in ¶ 1A.

2

profitability and transferred Orr to the firearms division, giving him the title of assistant sales coordinator.  Orr received the "assistant" position because his chemical sensitivities prevented him from traveling on the road to negotiate deals with consignors, attending gun shows, and attending the two annual firearms auctions.  Orr was able, however, to coordinate sales from the workplace by soliciting consignments, obtaining consignment agreements, and soliciting buyers for those consignments.  (Id. ¶¶ 10-13.)  He also received and handled firearms and weapons sent to the workplace, conducted appraisals and related research, determined commission structure and negotiated reserves, and prepared auction catalogues.  (Id. ¶¶ 15-17.)  JDJ's president and co-defendant, James D. Julia, assumed the additional duties that Orr could not perform by traveling to meet and negotiate with potential consignors buyers, attending gun shows, and overseeing the actual auction events.  (Id. ¶ 14.)  JDJ paid Orr a base annual salary of $32,000 and an incentive bonus based on his individual performance and the division's profitability.  (Id. ¶ 22.)  Orr's incentive bonus in his first year exceeded $20,000.  (Id. ¶ 23.)  The auctions of the firearms division produce a substantial amount of the gross revenue generated by JDJ's business operations (Id. ¶¶ 19-20.)

Throughout Orr's employment, Mr. Julia insisted that all JDJ employees adhere to the policy prohibiting personal fragrances and even sent employees home on a few occasions to wash off detected fragrances.  (Id. ¶ 29.)  Over time, Orr began to complain about co-workers wearing "masked" fragrances from products such as deodorant and hairspray that were not detectable by others.  (Id. ¶ 30.)  In response, in 2003 JDJ moved Orr's office to a corner of the building to minimize his potential exposure to fragrances and give him access to an open window.  JDJ also relocated the company snack machine to reduce foot traffic near Orr's new

office and gave Orr a key to a non-public access door so he could minimize his travel through the building.  (Id. ¶ 32.)

In advance of the spring 2003 auction, Sandy Davis, the administrative assistant in the firearms division, requested a share of Orr's incentive bonus due to the increased workload that she shouldered as a result of Orr's inability to perform certain tasks.  (Id. ¶ 33.)  JDJ persuaded Davis to remain employed through the 2003 auction cycle by promising to revisit her request if she continued to bear such a heavy workload during the fall auction cycle.  (Id. ¶ 34.)

Sometime in 2003, based on a complaint Orr made of Davis wearing a masked fragrance, Mr. Julia instructed all employees to avoid direct contact with Orr and to use an intercom to communicate with him, and took additional steps to prevent related problems for Orr, such as acquiring an air filtration system and offering Orr an oxygen tank and mask.  (Id. ¶ 36.)  In the summer of 2003, Orr commenced administrative proceedings with the Maine Human Rights Commission (MHRC), alleging that JDJ discriminated against him by failing to adequately accommodate his fragrance sensitivity.  (Id. ¶ 37.)  In September, Orr presented a note from his doctor indicating that he had "asthma, headache and upper airway sensitivity" and that he should "avoid exposure to perfumes/fragrances."  (Id. ¶ 38.)  After finding out about the administrative proceedings in September, Mr. Julia came to Orr's office, red in the face, and shook his finger at Orr and was visibly angry.  Julia told Orr that he had put the company in jeopardy by filing the charge and insisted that Orr would have to sign something saying that the working conditions were safe.  (Id. ¶ 39.)  Orr refused to sign whatever it was that Julia wrote up.  (Id. ¶ 40.)

That fall (2003), JDJ permitted Orr to work at home during the 20 or so days that auctions were taking place at the company's facilities due to Orr's complaints that fragrances worn by members of the public were seeping into his office.  (Id. ¶ 41.)  By the spring of 2004,

4

after continuing to receive complaints from Orr about co-workers' fragrances (especially Ms. Davis's), JDJ transferred Ms. Davis out of the firearms division and moved Judy Labbe into her old position as Orr's administrative assistant.  (Id. ¶ 42.)  Mr. Julia told Orr to let Labbe handle the bulk of the administrative tasks so that Orr could focus on the revenue-generating sales component of his job.  (Id. ¶ 36A (additional)[2].)  Orr received an incentive bonus of approximately $40,060 for his work during 2003.  (Julia Declar., ¶ 30.)

There are no details provided about events happening in 2004.  However, in early 2005, Orr received an incentive bonus of approximately $160,876 in connection with his work in 2004, a four-fold increase over the prior year.  (Id. ¶ 52.)

On March 2, 2005, Orr signed an employment agreement with JDJ for the time period of December 1, 2004, through November 30, 2005.  (Id. ¶ 44.)  As a term of the employment agreement, Orr agreed that his incentive bonus was offered as a performance and longevity incentive and was not guaranteed.  (Id. ¶ 46.)  The agreement also stated that, if the agreement was terminated for any reason during JDJ's fiscal year, Orr would not receive his incentive bonus.  (Id. ¶ 47.)  The agreement imposed on Orr a duty of confidentiality concerning leads, mailing lists and other intangible property.  (Id. ¶ 48.)  The agreement reserved to Mr. Julia the power to change or modify the agreement in a signed writing and characterized Orr as an employee-at-will.  (Id. ¶¶ 50-51.)

On May 11, 2005, Julia brought a customer into Orr's work area, and exposure to the customer put Orr in the emergency room for the remainder of the day.   The doctor wanted to admit Orr for observation.  (Id. ¶ 34A.)  Two weeks later, on the 25th, Orr again got very sick

---

[2]      The suffix "A" denotes plaintiff's statement of additional material facts.

5

after an exposure at work.  Orr notified Julia's assistant that he would be seeing his doctor the next day and would not be in, and to please tell Julia and JDJ's general manager, Fred Olson. (Id. ¶ 35A.)  Meanwhile, during the month of May 2005, the MHRC was attempting to mediate a solution to the pending administrative charge by working with the parties to see if they could agree upon an appropriate accommodation for Orr's chemical sensitivity.  (Id. ¶¶ 53-54.)  These efforts did not achieve a mutual agreement regarding an accommodation because Orr wanted the prohibition in the policy to extend to personal care products that triggered his chemical sensitivity despite having no scent or odor, whereas JDJ refused to enforce a policy against employees based on complaints about products having no discernable scent or odor.  Orr indicated that, if an employee voluntarily requested, he would research the products used by an employee to determine if they emitted particles or chemicals associated with his chemical sensitivity.  (Id. ¶¶ 56-58.)  In late May of 2005, after being unable to agree to a fragrance-free policy, the MHRC investigator issued her decision (dated May 26, 2005) that there were no reasonable grounds to conclude that JDJ discriminated against Orr.  (Id. ¶ 62.)  Orr, who was then out of the office on account of the May 25 flare up, did not report to work later that week, on advice from his doctor that he should avoid the office, if possible.  (Id. ¶¶ 63-64, 67.)  When asked about his intentions by Mr. Olson, Orr responded that he would work from home if that was what JDJ wanted.  (Id. ¶ 65.)  Mr. Julia learned of this development soon thereafter and spoke with Orr by telephone to discuss the change.  (Id. ¶ 68.)

Julia told Orr that he was too valuable to the division and that he did not want to lose Orr. (Id. ¶ 8A.)  They talked about Orr working from home and Julia agreed that Orr had worked from home successfully before when auctions were being held on-site.  When Orr stated the opinion that the most valuable part of Orr's job was getting valuable consignments and that he

could do that just as well from home, Julia did not disagree.  (Id. ¶ 9A.)  When Orr had originally been promoted to the assistant sales coordinator position, Julia had told him not to worry about the clerical issues and that Orr's job was to find and get consignments for auctions.  (Id. ¶ 10A.)  During the phone conversation Julia did not mention any intent to renegotiate Orr's contract or cut his pay for the upcoming fall 2005 auction.  (Id. ¶ 11A.)  Julia told Orr that he would guarantee the bonus Orr had earned at the spring 2005 auction, even if Orr should no longer be employed with JDJ at the end of the year.  (Id. ¶ 12A.)

Julia agreed, on behalf of JDJ, to give the new arrangement a try.  Julia emphasized that the new arrangement was an experiment and would not continue if Julia concluded that it was not working out.  (Id. ¶¶ 70-71.)  Thereafter, Julia authored an e-mail setting forth his decision concerning how things would proceed.  (Id. ¶ 74.)  The June 9, 2005, e-mail stated that, because of the uncertainty surrounding Orr's continuing role with JDJ, Orr's job responsibilities and expectations for financial remuneration were "open" and depended upon how the parties could "reinvent or re-develop" Orr's position.  (Id. ¶ 75.)  Mr. Julia expressed a desire to "develop something that will work for both of us."  (Id. ¶ 77.)  Julia indicated that he would need to hire an additional employee to make up for the work Orr would be unable to perform from home.  (Id. ¶ 78.)

To facilitate Orr's work from home, JDJ paid to install at Orr's home a dedicated telephone line, high-speed DSL Internet connection, fax machine and various other pieces of office equipment.  (Id. ¶ 80.)  While working from home, Orr primarily researched and followed up on consignment leads.  He no long communicated with walk-in customers, provided on-site firearm knowledge and technical expertise, arranged the firearms catalogue, contributed to the answering of incoming telephone calls, or provided descriptions and condition reports to

7

consultants and potential buyers.  (Id. ¶ 81.)  Much of the burden resulting from Orr's inability to

perform many of his former tasks fell on the division's administrative assistant, Judy Labbe, and

on J.R. LaRue, an expert on antique firearms whom JDJ had previously retained as a consultant

on a per diem basis.  (Id. ¶ 82.)

The fall 2005 firearms auction took place on October 3-6, 2005, and generated gross

revenue of approximately $9.2 million.  (Id. ¶ 85.)  After the auction, Julia evaluated Orr's

contribution to the firearms division since he began working from home in June.  (Id. ¶ 86.)

Julia developed a new formula for calculating Orr's incentive bonus for the fall 2005 auction and

for future auctions, which he communicated to Orr in a letter dated November 21, 2005.  (Id. ¶

87.)  Specifically, because Judy Labbe's contributions had increased significantly due to Orr's

decision to work from home, Julia stated that Labbe would receive 7.5 percent of net profits and

that Orr would receive 7.5 percent, whereas the contract terms had provided for Orr to receive 15

percent of the auction's net profits.  (Id. ¶¶ 88-89.)  According to the Julia defendants, this

revision to the incentive program would have reduced Orr's incentive compensation by about

$75,000.  (Id. ¶ 90.)

Orr called Julia after receiving the letter and left a voice mail message demanding that

Julia call him immediately.  (Id. ¶ 91.)  In the phone conversation that followed Orr said it was

unfair to justify cutting his incentive pay in half based on others taking up "slack" in the office.

Orr stated that he took exception to Julia unilaterally cutting his incentive pay for the fall auction

without any negotiation.  (Id. ¶¶ 15A, 19A.)  Julia emphasized Orr's failure to perform office

tasks and Orr emphasized that being home allowed him to spend all of his time marketing, which

(in Orr's opinion), is a far more profitable task.  Orr notes that the fall auction was the largest

grossing gun auction ever and that Julia increased the goal for the spring auction from $4.5

million to $6 million because of consignments already lined up by Orr.  (Id. ¶¶ 16A-18A, 38A.)
Orr also objected to the idea that Labbe's performance of office work was deserving of half of his
commission.  (Id. ¶ 20A.)  During the conversation Julia expressed a refusal to negotiate over the
issue.  (Id. ¶ 21A.)  Julia told Orr that he had already hired a new employee to work in the office
(starting after the fall auction).  (Id. ¶ 23A.)  The new employee was hired to be an assistant sales
coordinator for the firearms division, like Orr.  (Id. ¶ 84.)

When Julia refused to negotiate with Orr, Orr told him that he was discriminating against
Orr based on his disability and was cutting his pay because he knew that it would be difficult for
Orr to find another job due to his chemical sensitivity.  (Id. ¶ 25A.)  Orr told Julia that if he cut
Orr's pay unilaterally Orr would file a complaint of discrimination with the Maine Human Rights
Commission.  (Id. ¶ 26A.)  Orr admits that, toward the end of the telephone conversation, he
informed Julia that he would not file a claim of disability discrimination with the MHRC if Julia
paid him the full 15% bonus that he was demanding.  (Id. ¶ 95.)

A few days later, the two spoke again by phone.  Julia told Orr that he would pay Orr's
incentive pay as laid out in the contract (15%), but that their employment relationship was at an
end.  (Id. ¶¶ 27A, 32A.)  Orr asked why and Julia responded that it was because Orr had
"threatened" to file another charge with the MHRC.  (Id. ¶¶ 1A, 28A.)  Julia said the incentive
payment would be made in the spring of 2006, but only if Orr helped Judy Labbe and Carl (the
new employee) whenever they had questions during the transition.  (Id. ¶ 32A.)  Julia informed
Orr that, in exchange for the full amount of the bonus and other contract pay, he wanted an
assurance from Orr that Orr's transition out of employment with JDJ would be smooth and that
Orr would return all of JDJ's property, including consignment leads.  (Id. ¶ 100.)

9

Julia maintains that, even if Orr had not threatened to file a charge of discrimination, he would have terminated Orr based on his assessment that the work at home arrangement was not going to work given Orr's compensation expectations for the amount of work he contributed. (Id. ¶ 102.)  Orr maintains that he believes Julia was just using the limitations caused by Orr's disability as an excuse to cut Orr's share in the profits;  that Julia was exploiting the fact that Orr would have a hard time securing alternative employment.  (Id. ¶¶ 3A-4A.)  According to Orr, Julia did not make any comments about Orr's demeanor or the manner in which Orr was opposing Julia's unilateral decision to cut his pay and, when Julia told Orr that he was terminated, Julia did not give any reason other than the fact that Orr threatened to file a complaint with the MHRC.  (Id. ¶¶ 5A, 6A.)  Prior to Julia's unilateral decision to reduce Orr's incentive pay, neither Julia nor anyone else associated with JDJ told Orr that his decision to work from home was causing problems for JDJ.  (Id. ¶ 7A.)

*Defamation claim*

Orr contacted Patrick Hogan, owner of Rock Island Auction Company, in February 2006 to inquire about the possibility of working for Mr. Hogan's company.  (Id. ¶ 111.)  Thereafter, Orr sent a written proposal to Mr. Hogan describing his experience working for JDJ and the value that he could bring to Mr. Hogan's operations.  (Id. ¶ 113.)  Hogan informed Julia that Orr contacted him and inquired about Orr and his history working for JDJ.  (Id. ¶ 116.)  Julia informed Hogan that Orr was no longer employed with JDJ and that he suffered from a severe sensitivity to fragrances and, consequently, could work only from his home.  (Id. ¶ 117.)  Hogan asked Julia if Julia had "screwed" Orr by unfairly denying him incentive pay and Julia responded that it was not true.  (Id.; Julia Dep. 199-200.)  Following up on Orr's proposal regarding employment with Rock Island Auction Company, Hogan e-mailed Orr and reported that he was

not interested and that Julia "has a differing view of your separation from his company." (Id. ¶¶ 118-120.)

In March of 2006, Orr received an incentive bonus of approximately $157,850 for the 2005 spring and fall auctions. (Id. ¶ 122.) In May, Orr filed a charge of disability discrimination and retaliation with the Maine Human Rights Commission. (Id. ¶ 125.) After issuing a notice of right to sue letter to Orr on November 30, the MHRC administratively dismissed Orr's charge. (Id. ¶ 126.)

*Claim for unpaid wages*

Orr did not raise a claim that he was entitled to overtime compensation for his work at JDJ until after his employment with JDJ was terminated. (Id. ¶ 127.)

**B.    Facts pertaining to the defendants' claims for reimbursement**

On March 3, 2005, Orr and JDJ entered into a written contract regarding Orr's pay for 2005. As has already been related, Orr worked from home for a portion of 2005 and, in that capacity, did not perform all of the duties he had performed while working out of JDJ's office. Nevertheless, on March 14, 2006, JDJ paid Orr $157,850.03, less taxes and deductions. When this payment was tendered, the Julia defendants understood that Orr claimed entitlement to that amount as incentive pay. The Julia defendants' counterclaims assert, among other things, that they have a legal right to recover the $157,850.03 they paid Mr. Orr in March 2006. (Pl.'s Statement ¶¶ 1-4, Doc. No. 37.)

The letter containing the check for $157,850.03 was authored by defense counsel. It contained the following language:

. . . .

11

We continue to believe that there is no obligation to pay Mr. Orr any incentive compensation under his Employment agreement for a variety of reasons, including but not limited to:

> (1) Mr. Orr was not employed in good standing through November 30, 2005 as required by the Agreement;
>
> (2) The incentive compensation provisions of Paragraph 2 of the Agreement were changed by mutual agreement as reflected in Mr. Julia's email to Mr. Orr dated June 9, 2005;
>
> (3) Mr. Orr, by unilaterally insisting upon staying home after June, 2005, and thereby being unable or unwilling to perform many of his employment duties, breached the terms of his Employment Agreement and/or failed to perform his job in a satisfactory manner, thus disqualifying himself for incentive compensation;
>
> (4) Mr. Orr, in his oral and written communications with Mr. Julia, engaged in highly unprofessional and disruptive conduct, thus forfeiting his right to incentive compensation.

Despite his conviction that Mr. Orr was not entitled to receive any incentive compensation under the Terms of the Employment Agreement, Mr. Julia previously informed Mr. Orr that he was willing to pay him the full value of the incentive compensation, plus two weeks severance, in order to effect a smooth transition of the leads he had been developing and to avoid the distraction of prolonged negotiations.

As Mr. Julia told Mr. Orr he would do, he asked his counsel to draft up an agreement outlining the terms of the severance package and the required transition services. At the same time, Mr. Julia wanted to reaffirm Mr. Orr's contractual and common law obligations to refrain from using or disclosing consignment leads, customer lists and other secret, confidential or proprietary information, to return to the company all of its tangible and intangible property, and to refrain from disparaging or defamatory communications with the company's clients, vendors and consultants. Thus, these provisions were part of the proposed agreement as well. In order to ensure that the controversy was finally resolved, the agreement also contained a standard release of claims.

Given the passage of time and Mr. Orr's unwillingness to cooperate, however, Mr. Julia has concluded that Mr. Orr's transition assistance would no longer be of any real value to the company. Moreover, because Mr. Orr is legally obligated to return our client's property and proprietary information, independent of any severance agreement, we have decided to pursue that matter separately, as explained below.

12

> Consequently, Mr. Julia has dropped his request for transition assistance and has decided to simply pay the disputed incentive compensation without conditions. To that end, please find enclosed a check for the gross sum of $157,850.03, less required tax withholdings, made payable to Mr. Orr.  Aside from our unconditional payment of the incentive compensation, the demand outlined in your letter February 13 is rejected.
> . . . .

(Id. ¶ 5;  Keegan Aff. Ex. A, Doc. No. 33-2.)  In response to Orr's discovery interrogatories, Julia asserted under oath that he tendered the payment hoping that the payment would prevent the parties' "feud" from resulting in litigation.  (Pl.'s Statement ¶ 6;  Defs.' Responses to Pl.'s Interrogs. ¶ 15, Doc. No. 34.)

### DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

**A.      Defendants' Motion for Summary Judgment (Doc. No. 23)**

Orr's suit against Julia consists of four counts.  The first count asserts unlawful retaliation in violation of the Americans with Disabilities Act (ADA), the Maine Human Rights Act (MHRA), and the Maine Whistleblowers' Protection Act (MWPA).  The second count asserts a violation of Orr's alleged right to overtime wages under the Fair Labor Standards Act (FLSA) and analogous rights under Maine law.  The third count asserts a claim of defamation.  The fourth asserts unlawful retaliation under the FLSA.  (Am. Compl. ¶¶ 50-64.)  The fourth count was asserted only after the Julia defendants filed their counterclaims.  (Mot. to Amend, Doc. No. 7.)  The Julia defendants challenge all of Orr's counts in their motion for summary judgment.

**1.      *Retaliation under the ADA, MHRA and MWPA (count I)***

The Julia defendants argue that count I is not actionable as a matter of law because Orr's "threat" to file charges with the MHRC if he did not receive the full incentive pay was not activity protected from retaliation under federal and state civil rights statutes.  (Defs.' Mot. at 11-18.)  This argument challenges Orr's ability to demonstrate the first element of a prima facie case of unlawful retaliation:  whether he engaged in protected activity.  Thompson v. Coca-Cola Co., 522 F.3d 168, 181 (1st Cir. 2008).   The defendants do not challenge Orr's ability to demonstrate any of the other elements of his retaliation claim and they do not set their motion up as a traditional McDonnell Douglas challenge, presumably because the record supplies direct evidence of a retaliatory motive.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The discussion that follows proceeds from an understanding that Orr's threat to commence proceedings with the MHRC was a motivating factor in the decision to terminate Orr's employment.

Both the Americans with Disabilities Act (ADA) and the Maine Human Rights Act (MHRA) prohibit an employer from retaliating against an employee because the employee "opposed" an act that is prohibited by the ADA or because the employee filed a charge against the employer for such an act.  42 U.S.C. § 12203;  5 M.R.S.A. § 4633(1) & (2).  Protected opposition to an act undertaken by an employer exists even if the act opposed is not, in fact, prohibited, so long as the employee has a reasonable belief that it is prohibited and communicates that belief in good faith.  Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).  Similarly, the Maine Whistleblowers' Protection Act (MWPA) prohibits retaliation based on an employee's good faith complaint that a workplace activity is illegal, when the employee has a reasonable belief that the activity is illegal.  26 M.R.S.A. § 833(1)(A)-(B); Tripp v. Cole, 425 F.3d 5, 9 (1st Cir. 2005).

Orr argues that he held the reasonable belief that Julia was discriminating against him in terms of compensation based on his inability to work out of the office, even though his absence from the office did not undermine his ability to perform his essential, consignment-generating duties.  (Pl.'s Opposition at 4-5.)  This is an artful argument because there is an inference that arises from the parties' historical dealings that Julia must have regarded Orr as fully able to perform the essential functions of his position from home.  The fact that the fall auction was so successful tends to buttress this inference.  The potential finding that Orr's performance of the essential functions of his position contributed to an extremely successful auction invites a rather unfavorable assessment of Julia's attempt to cut Orr's bonus compensation in half.[3]  Despite these

---

[3]      There is a genuine issue in this case whether Orr reasonably believed that Julia had decided to withhold fair compensation under a false pretense that Orr's inability to perform work in the office made him less worthy, by half, of sharing in the profits generated by the firearms division.  According to Orr, he communicated to Julia his subjective belief that Julia was discriminating against him based on his disability by cutting his pay because he knew that it would be difficult for Orr to find another job due to his chemical sensitivity.  Orr also articulated to Julia that

appearances, however, Orr's argument looks untenable at first blush because, other than the dispute over what a fair bonus would be, the record really affords no circumstantial or direct evidence of any underlying or antecedent discriminatory animus that might have motivated Julia's decision to cut the bonus in half.  Assuming that half of the bonus was unfair in light of Orr's contributions, it may have been greed, nepotism[4] or some other motive that informed Julia's decision other than an intention to discriminate.  On further reflection, however, the dispute over what constitutes fair pay for an accommodated employment position is a dispute that implicates the protections afforded by the ADA even in the absence of any evidence of discriminatory animus and it is that basic fact that renders Orr's protests over the size of the bonus protected activity.[5]

The ADA prohibits "discrimination" broadly.  As construed in the ADA, discrimination includes "limiting" or "classifying" an employee "in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee."  42 U.S.C. § 12112(b)(1).  It also includes the use of "standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability."  Id. §

---

he believed Julia's personal appraisal of the incentive bonus was not at all fair in relation to Orr's consignment-generating (revenue-generating) work for the firearms division.  The jury could fairly conclude on this record that Orr's perspective was a reasonable one for him to entertain.  The jury could conclude from Orr's testimony that Julia acknowledged that the most important work Orr performed was his work related to obtaining consignments.  While Orr worked in the office he performed that task primarily over the phone, as he was generally permitted to avoid personal contact with the public.  Julia evidently recognized that these core functions could be adequately performed from Orr's home, because Julia paid for office equipment to be installed at Orr's home for those tasks.  Although it might belong in the category of "no good deed goes unpunished," one appearance that the record could give to a fact finder is that Julia must have striven to accommodate Orr because of the value Orr added to the division's objective of obtaining worthwhile gun consignments for JDJ's related auctions, even though Orr could not reliably interact with the public in person.  According to Orr's testimony, there was never any suggestion to him of any undue difficulties arising from Orr working at home until after the very successful fall auction was over and the matter of commissions was on the table.

[4]      According to Orr, Ms. Labbe is related to Mr. Julia.  (Statement of Facts ¶ 20A.)

[5]      The Julia defendants recognize that the record presents a dispute over the value of Orr's contribution.  (Defs.' Reply Mem. at 3, Doc. No. 44.)

12112(b)(3)(A).   Finally, for present purposes, discrimination includes the failure to provide reasonable accommodations and denying employment opportunities based on the need to provide an accommodation.  Id. § 12112(b)(5)(A)&(B).  The MHRA affords analogous protection. 5 M.R.S. § 4553(2)(A), (C) & (E)-(G).  The facts of this case present a dispute between Orr and Julia over what constitutes fair compensation within an accommodated workplace.  That focused dispute is set against the backdrop of a more protracted effort to arrive at a reasonable accommodation acceptable to both Orr and Julia.  Although Julia expressed a willingness to accommodate Orr's chemical sensitivity by letting him work from home, Julia left open the largest component of Orr's compensation package.  The receipt of fair compensation in exchange for performing the essential functions of a job is among the most basic rights extended by the ADA, id. § 12112(a), and failure to accommodate is actionable under the ADA even in the absence of animus.  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007) (providing elements of a "reasonable accommodation claim").  Julia's decision to leave the matter of bonus compensation open until after the fall auction, followed by his eventual use of an entirely subjective standard to administer the bonus was, perhaps, not the wisest way for him to proceed.  Consequently, Orr was engaged in protected activity when he objected to Julia's indication that he would cut Orr's bonus compensation in half.  I cannot conclude on this record that it was not objectively reasonable for Orr to believe that the dispute over his compensation was a component of his right to receive a reasonable accommodation under the ADA.  That does not resolve the entire challenge to the retaliation claim, however.

The Julia defendants argue that, even if Orr was engaged in protected activity, he went "too far" in expressing his opposition and crossed the line between protected opposition activity and unprotected acts of "extortion."  (Defs.' Mot. at 15-18.)  They argue that it is never proper for

17

an employee to "threaten" filing a charge in order to leverage a concession from the employer. They cite six cases in support of this argument that require some individualized discussion. I am not ultimately persuaded that the question of whether Orr went "too far" is susceptible to dispositive legal treatment on the existing record.

In David v. ANA TV Network, Inc., the Sixth Circuit, in an "unpublished" opinion, affirmed a pre-trial entry of judgment for the defendant on a claim that the employer retaliated for the plaintiff's statement of an intent to file a charge of discrimination. Nos. 98-2288/98-2289, 2000 U.S. App. Lexis 2477, 2000 WL 222575 (6th Cir. Feb. 16, 2000). The employer in the case argued that it terminated the plaintiff's employment because of an "inflammatory and threatening letter" that prevented an effective working relationship going forward. 2000 U.S. App. Lexis 2477, *12, 2000 WL 222575, *4. The court concluded that the record contained *no* evidence that the employer's justification was a pretext for national origin discrimination because the record demonstrated that the decision-making supervisor maintained positive relationships with all other employees sharing the plaintiff's national origin and had never demonstrated any negative feelings about the plaintiff's national origin, and that the plaintiff's problems arose from a personality conflict and performance issues. By logical extension, the court rejected the plaintiff's retaliation claim because it could find no reasonable basis for the plaintiff to believe that the adverse developments occurring for him in the workplace arose from national origin discrimination, removing his "inflammatory and threatening" letter from the category of protected opposition activity. 2000 U.S. App. Lexis 2477, *12-16, 2000 WL 222575, *4-5. David is best understood as a case in which there was *no* circumstantial evidence of discriminatory animus preceding the plaintiff's delivery of a letter threatening a claim of discrimination. Additionally, because the case did not involve an issue of reasonable

18

accommodation it does not speak to the question of whether protests over an employer's decisions on accommodations come within the category of protected opposition activity.

In <u>Sackey v. City of New York</u>, the District Court granted summary judgment to the employer where the plaintiff's supervisor fired her because she threatened to file a claim of sex discrimination. The court made its ruling based on a finding that the plaintiff offered "no evidence" of disparate treatment based on sex in any of the underlying circumstances. No. 04-Civ-2775 (WHP), 2006 U.S. Dist. Lexis 5483, *17-18, 2006 WL 337355, *5 (S.D.N.Y. Feb. 15, 2006). <u>Sackey</u> is essentially the same as <u>David</u>. It has no bearing on this case.

In contrast to <u>David</u> and <u>Sackey</u>, the record presented in this case demonstrates that the Julia defendants found Orr to be a difficult and problematic employee precisely because of his chemical sensitivity and there was a long-standing "issue" related to his ability to work in the office environment. Subsequently, when Orr sought to work from home, Julia accommodated that possibility, which can support a finding that Orr was able to perform the essential duties that JDJ hired him to perform. Julia's decision to make the matter of compensation an open question, and his subsequent, non-negotiable imposition of a 50 percent cut in the preexisting bonus formula, set the stage for a factual controversy over the question of whether Julia fairly or unfairly weighed the impact of Orr's chemical sensitivity in relation to his contribution to the fall auction. Someone in Orr's position might reasonably believe that he was being discriminated against in violation of the ADA in relation to the compensation offered as part of a workplace accommodation, particularly in light of the various constructions the ADA gives in section 12112(b) for the term "discriminate."

The Julia defendants also reference <u>Spadola v. New York City Transit Authority</u>, 242 F. Supp. 2d 284 (S.D.N.Y. 2003), and <u>Wolcott v. Champion International Corporation</u>, 691 F.

Supp. 1052 (W.D. Mich. 1987).  In Spadola, the plaintiff threatened to write up a supervisor for sexual harassment after he gruffly left her presence while being questioned about a performance issue and she called him back sarcastically, stating, "honey, sweetie, dear, come back."  Spadola, 242 F. Supp. 2d at 292.  Not surprisingly, the court concluded that the plaintiff could not have held a good faith belief that he was subjected to actionable harassment, so his threat could not fairly be regarded as protected activity.  Spadola is essentially the same as David and Sackey, having no resemblance to Orr's case.  Wolcott is slightly different.

Wolcott presents a whistleblower case in which the plaintiff threatened to report past environmental issues and regulatory violations that arose earlier in his employment history.  The court rejected the claim based on a finding that the employee's threat over stale matters was not made in a good faith effort to disclose or prevent illegal conduct, only in an attempt to pressure the company not to eliminate certain jobs, including his own.  Id. at 1058-59.  In other words, there actually was a legitimate basis for the employee to assert that violations had occurred, but the timing and manner of the communication demonstrated the absence of good faith.  In contrast, Orr's threat to file a claim was made in the context of a disagreement over an ongoing controversy related to the impact that Orr's chemical sensitivity (and his consequential absence from the office) had on his ability to contribute to the essential task of generating consignments for auctions.  Moreover, the controversy followed in the wake of the MHRC's efforts to negotiate an appropriate accommodation, which tends to support a finding that the new dispute, like the old, was within the protective penumbra of the ADA and the MHRA.  Because the opposition activity in this case involved an existing controversy and not a stale dispute over remote occurrences, the approach taken by the court in Wolcott would not apply here.

Finally, the Julia defendants cite <u>Hochstadt v. Worcester Foundation for Experimental Biology</u>, 545 F.2d 222 (1st Cir. 1976).  Foremost, and critically, the Hochstadt Court reviewed an order on a motion for a preliminary injunction, not a motion for summary judgment.  <u>Id.</u> at 225.  The Court noted that "it is plainly a delicate matter to separate out the protected from the nonprotected conduct" when an employer relies on the tenor or disruptiveness of opposition activity to justify a termination.  <u>Id.</u> at 229.  The Court affirmed the denial of preliminary injunctive relief based on its conclusion that it could not say the district court erred in its *factual findings*.  <u>Id.</u> at 230.  <u>Hochstadt</u> obviously has no direct bearing here because the district court was called upon to make findings of fact related to the probability of success on the merits in a motion seeking a preliminary injunction, whereas factual disputes arising from the instant summary judgment motion must be resolved in favor of Orr.  Moreover, although the Hochstadt Court recognized that there is a material question in cases such as this whether a complainant went "too far" with oppositional activity, <u>id.</u> at 231, it is apparent from the Court's discussion that the question is a factual one and that the Court affirmed the district court's decision because the findings under review reflected one "permissible interpretation of the evidence," <u>id.</u> at 234.  In effect, the Court held that, as a matter of law, an employer may justify an adverse employment action based on the disruptiveness or harmfulness of an employee's opposition activity, but that the questions of whether the employer's justification need be credited and whether the employee's subjective belief is reasonable are both issues of fact.[6]

---

[6]      Also cited are <u>Rollins v. State of Florida Department of Law Enforcement</u>, in which the Eleventh Circuit reviewed factual findings following trial, not a summary judgment determination, 868 F.2d 397 (11th Cir. 1989); <u>Burns v. Blackhawk Management Corporation</u>, in which summary judgment entered because the plaintiff could offer no justification for directing his opposition activity toward the company's customers and where the employer had always tolerated the plaintiff's in-house opposition activity, 494 F. Supp. 2d 427, 435-36  (S.D. Miss. 2007); and <u>Fitch v. Solipsys Corporation</u>, in which summary judgment entered on a retaliation claim because there was no

Orr's opposition activity took place in the context of a private phone conversation with his supervisor.  According to Orr's version of events, the statements he made were in no way uncouth, obnoxious or otherwise offensive on a personal level.  This tends to undermine the Julia defendants' position that Orr had done something inimical to an ongoing employment relationship, such as personally attacking Julia or behaving in an unacceptably insubordinate manner.  The privacy of the communication would also tend to undermine a finding of any harm to the employer's goals or interests generally.  Certainly no more harm would arise from the mere threat to file a charge than would arise from the actual commencement of a formal charge of discrimination.  If the Court were to embrace the argument advanced by the Julia defendants, it would mean that an employer would always be able to discharge an employee engaging in protected opposition activity whenever the employee (likely untrained in federal and state law) made a tactical misstep and threatened to file suit.  Such a rule is uncalled for when the underlying dispute actually concerns rights protected by the ADA or an analogous statute.  After all, even when the employee merely expresses the belief that his or her rights are being violated, any reasonable employer will understand that the potential for litigation exists, even though the employee has not voiced a present intention of filing a charge.  The simple fact of the matter is that individuals who have a reasonable, good faith belief that they qualify for the protection afforded by the ADA and/or analogous statutes *should* assert their rights when there is a reasonable basis for believing that their rights are being violated.  They are entitled to be protected against retaliation when they do so.

---

evidence capable of supporting the plaintiff's professed belief that any disparate treatment based on sex or race was taking place in the workplace, 94 F. Supp. 2d 670, 677-78 (D. Md. 2000).

The Julia defendants persist that they were not required to design a new position for Orr, let him work from home, or pay him the same amount for performing fewer tasks. (Defs.' Mot. at 14-15.)  However, the point here is that Julia did permit Orr to work from home, which supports an inference that Julia regarded the contributions that Orr could continue to make from home to be significant in terms of at least the fall firearms auction.  Moreover, according to Orr, Julia once told him not to worry about clerical tasks in the office and that his real job was to find and get consignments for auctions.  Julia did not make a decision that working out of the office was essential to Orr's profitability to the firearms division.  Had he made such a decision, or had he promptly redefined Orr's position to specify JDJ's new expectations and obligations in terms of contribution and compensation, then this case would be susceptible to analysis in terms of giving deference to the employer's assessment of what is essential to a given position.  See, e.g., Mulloy v. Acushnet Co., 460 F.3d 141, 150 & n.5 (1st Cir. 2006) (suggesting that it is a difficult challenge to prove that working at home is a reasonable accommodation).  As it stands, however, Julia's "wait and see" approach and his decision to fire Orr based exclusively on Orr's opposition activity puts this case in a different category.  Summary judgment should not enter against count I.

### 2.      *Overtime and Wage Claims (count II)*

In his second count, Mr. Orr claims entitlement to overtime compensation under the FLSA, 29 U.S.C. § 207(a)(1), and under state wage law, 26 M.R.S. § 670.  He also seeks liquidated damages under 26 M.R.S. § 626.  Orr's claim under the FLSA covers the time period from April 23, 2005, through his termination on November 28, 2005.  (Pl.'s Opposition at 7.) The state law claim covers a broader period from January 1, 2002, through November 28, 2005. (Id.)  Orr concedes that the alleged violations were not willful, which is what truncates his claim

under the FLSA.  (Id.)  The parties agree that Orr would only be entitled to overtime for working

in excess of 40 hours per week during the time periods in question if Orr was not "exempt" under

the FLSA or Maine law.  (Id. at 8;  Defs.' Mot. at 19.)  They also agree that Orr meets most of

the factors that would support a finding that Orr's former employment was exempt by virtue of

Orr being employed in an administrative capacity:  (1) he earned more than $455 per week in

salary;  (2) his primary duties involved office or non-manual labor;  and (3) he exercised

discretion and independent judgment in his position of assistant sales coordinator.  They dispute,

however, whether Orr's work pertained to JDJ's management policies or general business

operations.  Additionally, there is a dispute whether Orr's work involved any exercise of

discretion and independent judgment for a six-month training period that Orr went through

between January and June of 2002.  See 29 C.F.R. § 541.200.  (Pl.'s Opposition at 7;  Defs.' Mot.

at 19.)

a.   *Management or general business operations*

 The standard that governs whether Orr engaged in general business operations that

exempt him from coverage under the FLSA is set by regulations authored by the Department of

Labor.  The regulations refer to the exemption in question as the "administrative exemption."  29

C.F.R. § 541.201(a).  To qualify, "an employee's primary duty must be the performance of work

directly related to the management or general business operations of the employer or the

employer's customers."  Id.  Such work must "directly relate[] to assisting with the running or

servicing of the business, as distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service establishment."  Id.

The Julia defendants argue that summary judgment should enter on this claim because

Orr's primary duties were administrative in nature.  (Defs.' Mot. at 21.)  Orr says his primary

duties were more in the nature of production and sales than assisting or servicing JDJ's general business operations.  (Pl.'s Opposition at 9-10.)

It is clear from the language of the administrative exemption "that the exemption is not to be limited solely to so-called 'management' personnel."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 10 (1st Cir. 1997).  The exemption extends to employees whose work directly relates to the employer's general business operation, such as employees who carry out the employer's primary business objectives.  Id.

This case involves a business with a primary objective of selling, on consignment, items having value not necessarily by virtue of any inherent characteristics, but by virtue of some sentimental value arising from a historical or cultural association.  Due to this basic aspect of the business, Orr's duties required that he not only develop relationships with potential consignors on behalf of JDJ, but also that he provide a service to JDJ and its consignors in the form of research relating to the authenticity and value of the goods consigned for auction and in the form of marketing those goods to potential collectors.  It is difficult to understand why such duties are not fundamental to the performance of an auction company's business operation.

In Reich, the First Circuit reviewed a decision that marketing representatives of an insurance company were administrative workers because they played no role in generating the insurance company's product.  126 F.3d at 9.  The Court affirmed the decision, reasoning that the employees could not be regarded as production workers because they did not generate the policies and, therefore, must fall within the administrative exemption.  Id.  The Reich Court focused entirely on negating the "production" exception, rather than explaining the "administrative" exemption.  That approach does not work so well in this case because the administrative/productive dichotomy largely breaks down when one considers the nature of an

auction.  An auction is, essentially, a "production," but it cannot take place without the administrative work that develops customer relationships (particularly in relation to the consignors) and without the exercise of discretionary administrative judgment that is directly related to researching items in order to determined whether they should be solicited for inclusion in the auction event.  Thus, although auctions and sales are "produced" by JDJ, producing an auction is *the* general business operation that JDJ engages in, and Orr's primary duty is "directly related" to the administration of that business operation.  That fact means that Orr's work was predominantly oriented toward the administration of an event rather than toward selling or servicing products.  The actual language of the regulation supports this finding because it is disingenuous to say that Orr's work was not "directly related to assisting with the running or servicing of the business," and was more in the nature of "working on a manufacturing production line or selling a product in a retail or service establishment."  Id.

Orr's effort to liken his work to the work of a sales associate is not persuasive.  (Pl.'s Opposition at 10.)  Orr relies primarily on Martin v. Cooper Electrical Supply Company, 940 F.2d 896 (3d Cir. 1991).  In Martin, the Third Circuit affirmed a decision that "inside salespersons" were not subject to the administrative exemption.  Id. at 899.  The Third Circuit agreed that these salespersons were "productive" rather than "administrative" because their employer, an electric supply wholesaler, was in the business of producing sales and because the individual salespersons had a narrow scope of responsibility in relation to producing a subset of those sales, with a minimal impact on administrative operations, so they did not "service" the employer's business operations.  Id. at 903-904.  The Third Circuit also noted that the inside salespersons were not oriented toward administrative work because they were merely engaged in repetitive, individual sales transactions, as compared with marketing, promoting, developing or

26

facilitating sales generally.  Id. at 905.  The Court characterized the salespersons as "routine functionaries" rather than employees tasked with "major assignments."  Id. at 906.  Finally, the Court noted that the salespersons acquired and relied on skill, but that their skill was not applied in a manner that affected the "structure" of the employer's operations.  Id.

Orr's work for JDJ is different from the depiction of the work performed by the inside salespersons in Martin.  Orr's individual responsibilities are more in the nature of a major assignment targeted at the successful administration of consignment activity essential to the success of the spring and fall auction events.  Orr's application of skill or expertise would not merely result in a minor adjustment in a product's sales price, it would bear a direct relationship to whether an item would be included in the firearms auction.  Moreover, Orr was not merely serving as a transactional functionary.  Orr was interacting with potential consignors and buyers and performing research and making appraisals that would be of material concern to both JDJ and third parties as well.  These duties all have a direct relationship to the administration of a seasonal auction event.

Orr's duties and functions are similar to those performed in other employment positions identified by the Department of Labor as exemplifying administrative work.  For example, like insurance claims adjusters, who interview insureds and prepare damage estimates, Orr's duties included activities like communicating with potential consignors and evaluating items for inclusion in an auction.  29 C.F.R. § 541.203(a).  Also, although Orr did not "lead a team," his work was directly related to the operational success of the firearm's division auctions, a "major project" for JDJ.  Id. § 541.203(c).  And like an executive assistant or administrative assistant, Orr worked directly with a business owner, Julia, and was "delegated authority regarding matters of significance" in relation to the firearms auctions.  Id. § 541.203(d).  That Orr's duties bear a

resemblance to the duties undertaken in these other positions further supports the conclusion that his work qualified for the administrative exemption.  This conclusion forecloses the overtime claim under the FLSA.  It also forecloses recovery under the minimum wages provisions of Maine's employment practices law, subchapter 3.  See 26 M.R.S. § 663(3)(K) (Supp. 2007) (exempting certain salaried employees working in an "administrative" capacity);  Gordon v. Me. Cent. R.R., 657 A.2d 785, 786 (Me. 1995) (approving of superior court's recourse to federal law to construe the administrative exemption in 26 M.R.S. § 663(3)(K)).[7]

   b.  *Work as a trainee*

Orr contends that he was entitled to overtime pay between January 1, 2002, and June 2002, while he was being trained to be an assistant sales coordinator.  Orr says that he did not exercise independent discretion and judgment as a trainee.  (Pl.'s Opposition at 11.)  This claim is limited to state law because it is time barred under federal law.  To qualify for the administrative exemption, Orr's work as a trainee would require that he exercise discretion and independent judgment.  Reich, 126 F.3d at 13;  29 C.F.R. § 541.200(a)(3).  The record is not adequate to resolve this claim in the summary judgment context.  This leaves open the theoretical possibility of recovery on count two for overtime wages, liquidated damages, costs and attorney fees per 26 M.R.S. § 670.   There is also a thorny question of state law woven into this remote claim because Orr includes in his second count a plea for treble damages under 26 M.R.S. §§ 626 & 626-A.  Sections 626 and 626-A afford a claim for unpaid wages upon cessation of employment, when an employer fails to pay an employee in full within a reasonable time following termination.  But in

---

[7]      Department of Labor regulations also provide that Orr should be treated as exempt from the overtime provisions during 2004 and 2005 by virtue of being a highly-compensated employee working in an office environment performing non-manual work.  29 C.F.R. § 541.601(a), (c), (d).  This regulatory exemption would not impinge upon Orr's claim for overtime wages for 2002 or 2003 because he did not earn enough of a bonus in the prior years to crest $100,000 in annual compensation.  Nor is it clear that this particular regulation would even apply to Maine wage law, which is the only law that applies to Orr's claim for unpaid wages prior to 2005.

this case any right Orr has to unpaid wages for six months of alleged overtime work in 2002 arises solely by virtue of the "minimum wage; overtime rate" provisions of 26 M.R.S. § 664. That claim accrued well before Orr's termination, but is not time barred under Maine's applicable statute of limitation.  Orr argues that his post-termination demand for unpaid overtime also triggers a claim under sections 626 and/or 626-A, which yield treble rather than double damages. (Pl.'s Opposition at 12-13.)  The Julia defendants object to any claim under section 626 or section 626-A because they see the section 670 claim as the exclusive state law claim for failure to pay overtime.  (Defs.' Mot. at 25.)  The Law Court has never squarely said whether *any* claim under section 626 and section 626-A in a factual scenario like the one in this case would be foreclosed.  Orr's alleged right to payment of alleged overtime from years ago is premised on 26 M.R.S. § 664(3).  The liquidated damages for a violation of that right is statutorily set by "the corresponding remedies provision, section 670," not section 626.  Avery v. Kennebec Millwork, Inc., 2004 ME 147, ¶ 10, 861 A.2d 634, 637.  Unfortunately, it is unclear from the Avery opinion whether the Law Court would restrict a plaintiff like Orr to the section 670 remedy because the plaintiff in Avery apparently limited his plea under section 626 to a claim for unpaid vacation time and did not include his claim for unpaid overtime within his section 626 plea.  Id., 2004 ME 147, ¶ 2, 861 A.2d at 635.  Avery, in other words, is not especially helpful because plaintiff's counsel in that case did not even try to plead an entitlement to relief under sections 626 and 626-A for the overtime violation.  Unfortunately, none of the cases cited by the Julia defendants offers any useful guidance.  Due to the lack of clear legal guidelines, I recommend that the Court reserve judgment on the issue of double damages versus treble damages and simply deny the motion for summary judgment as to that portion of count II that concerns alleged overtime from 2002 when Orr was being trained as an associate sales coordinator.  The question of what

remedy is available, double or treble damages, need only be addressed should Orr obtain a

verdict on that issue and then it is a pure legal issue for this court to determine or to certify to the

Maine Law Court.

### 3.     Defamation (count III)

The Julia defendants assert that Orr does not have a defamation claim because Julia's

statements about Orr were all true and/or privileged under 26 M.R.S. § 598.  (Defs.' Mot. 25-26.)

Orr argues in opposition, exclusively, that Julia defamed him because Julia contradicted Orr's

statement to Mr. Hogan that Julia had unfairly denied Orr his proper incentive bonus.  (Pl.'s

Opposition at 13-14.)  The factual disagreement about whether Julia would pay Orr is not

actionable.  Defamation consists of a false and defamatory statement concerning another person.

Cole v. Chandles, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193.  Defamation does not exist based

merely on a false statement by the defendant that he treated or would treat the plaintiff fairly.

### 4.     Counterclaims as Retaliation (count I and count IV)

Finally, the Julia defendants ask that the Court grant summary judgment to them against

Orr's claim that it was unlawful retaliation under the FLSA for them to file counterclaims in this

civil action.  (Defs.' Mot. at 26-27.)  The FLSA prohibits "any person" from discharging or

otherwise discriminating against an employee "because such employee has filed any complaint

or instituted or caused to be instituted any proceeding under or related to this Act."  29 U.S.C. §

215(a)(3).  Following the Julia defendants' assertion of counterclaims in this action Orr amended

his complaint by expanding the retaliation claim in count I to assert that "the Complaint in this

matter was a motivating and substantial factor in Mr. Julia's decision to file counterclaims

against Plaintiff."  (Am. Compl. ¶ 51.)  Additionally, Orr added a fourth count that was not in his

original complaint.  Count IV incorporates all of the allegations in the complaint and alleges that

both of the Julia defendants unlawfully retaliated against Orr in violation of the FLSA.  (Id. ¶¶ 61-62.)  I conclude that the retaliation claim set out in count IV is limited to a claim arising from the fact that the Julia defendants asserted counterclaims against Orr.  I base that conclusion on the nature of the amendment, which was triggered by the filing of counterclaims (see Mot. to Amend, Doc. No. 7), and based on the fact that Orr did not raise a claim, prior to his termination, that he was entitled to overtime compensation under the FLSA.  Thus, the only protected activity that would have triggered the alleged retaliation would be Orr's post-termination civil action.

Orr argues that summary judgment should not enter against this portion of count I or against count IV because the counterclaims are baseless and were instituted exclusively to retaliate against Orr for seeking to enforce his statutory rights under federal and state law.  (Pl.'s Opposition at 14.)  Orr's view is that Julia paid Orr $157,850 in the hope of avoiding litigation and was angered and set out to punish Orr when Orr filed suit despite having received the full incentive bonus.  (Id. at 14-15.)

The assertion of a claim in litigation can sometimes constitute unlawful retaliation.  However, when a claim qualifies as a compulsory counterclaim it is only actionable as retaliation if it is totally baseless.  Ergo v .Int'l Merch. Servs., 519 F. Supp. 2d 765, 781 (N.D. Ill. 2007); Nesselrotte v. Allegheny Energy, Inc., Civ. No. 06-1390, 2007 U.S. Dist. Lexis 79147, *45-47 & n.25, 2007 WL 3147038, *12 (W.D. Pa. 2007) (collecting post-Burlington Northern cases addressing counterclaims as retaliation and permitting amendment of a complaint to assert such a claim).  "Baseless" is a powerful pejorative and it sets a difficult standard for the plaintiff to meet.  Here, Orr argues only that it is baseless for the Julia defendants to assert a right to return of the entire $157,850 incentive payment.  (Pl.'s Opposition at 14.)  Although it does appear highly unlikely that Orr should have to return the entire payment, particularly as Julia originally

31

offered half of the bonus to Orr based on Julia's own alleged assessment of what was due, the

claim is obviously a vehicle to recover some lesser portion of the payment in the alternative.  The

fact that counsel asserted a plea for relief in the extreme does not mean that the claims for breach

of contract and unjust enrichment are baseless in the sense that they could not possibly result in

some recovery.  Based on my review of the facts presented in the summary judgment record,

there is a legitimate factual dispute over the appropriate level of Orr's bonus compensation.  The

mere temporal relationship between Orr's commencement of this action and the defendants' filing

of the counterclaim does not generate a genuine issue of retaliatory motive, especially where Orr

fails to demonstrate in his presentation that the counterclaims are baseless on factual or legal

grounds.  Ergo, 519 F. Supp. 2d at 781-82.  Therefore, summary judgment should enter against

count IV and against that portion of count I that seeks to obtain relief based upon the filing of the

counterclaim.

**B.      Plaintiff's Motion for Summary Judgment (Doc. No. 31)**

The Julia defendants have asserted four counterclaims against Orr, two of which are

material to Orr's motion for summary judgment.  Count I of the counterclaim seeks a return of

the incentive bonus payment made for 2005 based on breach of contract.[8]  Count III also seeks to

recover that payment, but based on a theory of unjust enrichment.  (Am. Ans. & Counterclaims

¶¶ 33-35, 47-49, Doc. No. 15.)  Orr has filed a motion for summary judgment against these

claims, arguing that the letter authored by defense counsel that accompanied the $157,850 check,

and Orr's acceptance of the payment, resulted in a waiver of any right to seek the recovery of the

money.  (Pl.'s Mot. at 3-6.)  The Julia defendants dispute that contention.  They reject the idea

---

[8]      The breach of contract counterclaim also includes a claim that Orr breached an agreement to return JDJ's
property upon termination and not to disclose a certain "lead" to a competitor.  (Am. Ans. & Counterclaim ¶¶ 36-
37.)

that the letter constituted a waiver and also note that Orr failed to raise waiver as an affirmative

defense to the counterclaims.  (Defs.' Opposition at 2-5, Doc. No. 36;  See also Pl.'s Response to

Defs.' Counterclaims, Doc. No. 6.)

A finding of waiver requires evidence demonstrating an intention to permanently

relinquish a known right.  Smith v. Voisine, 650 A.2d 1350, 1353 (Me. 1994).  "Because a

waiver must be intentional, the inquiry focuses on the fundamentally subjective factors of

knowledge and intent of the person charged with the waiver."  Severance v. Choate, 533 A.2d

1288, 1291 (Me. 1987).  Julia has asserted by way of affidavit that he never intended to waive

any right to recover the incentive payment.  Orr does not appear to have any evidence to

challenge this assertion other than the content of defense counsel's letter.  Rather than suggesting

waiver, the language of the letter appears to reflect that the payment was being made without

requiring Orr to submit to any condition, such as the kind of conditions that would be recited in a

formal settlement agreement.  Indeed, counsel's letter indicates that such conditions had

previously been discussed by the parties, including a condition that Orr return certain property to

JDJ and that Orr cooperate in regard to certain "transition services" referenced in counsel's letter.

The letter relates that these conditions are no longer required because the law requires Orr to

return the property in question and the transition services were no longer desired.  The decision

to tender a disputed payment without requiring that the payee submit to any conditions does not

amount to waiver of the payor's right to dispute the payee's entitlement to payment.

Additionally, Orr recognizes in his papers that the Julia defendants were likely motivated to

make the payment in order to avoid exposure to double or treble damages under the wage

provisions of Maine's employment practices law.  An intention to avoid exposure to such

damages does not amount to an intention to relinquish a known right to resolve a payment

dispute through litigation.

## CONCLUSION

I RECOMMEND that the Court GRANT, IN PART, and DENY, IN PART, the

defendants' motion for summary judgment (Doc. No. 23), as follows:

I.     DENY the motion as to the core retaliation claims asserted in count I pursuant to the ADA, MHRA, and MWPA, but GRANT the motion as to the specific claim that the defendants' counterclaims were motivated by a desire to retaliate against Orr for commencing this civil action.

II.    GRANT the motion as to the core claim asserted in count II for overtime wages under federal and state law, based on the administrative exemption, but DENY the motion as to the limited claim under state law for overtime during Orr's period of training in the first half of 2002, reserving its legal decision on available remedy.

III.   GRANT the motion as to the claim of defamation asserted in count III.

IV.    GRANT the motion as to the FLSA retaliation claim asserted in count IV, which alleges that the defendants' counterclaims were motivated by a desire to retaliate against Orr for commencing this civil action.

I further RECOMMEND that the Court DENY the plaintiff's motion for summary judgment

(Doc. No. 31).

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

June 27, 2008

35